UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN ROSEMAN,

                     Plaintiff,              Civil Action No. 18-cv-13042
                                         Honorable David M. Lawson
v.                                 Magistrate Judge David R. Grand

INTERNATIONAL UNION,
UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA
(UAW), FCA US LLC,

                     Defendants.
_____/

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR EMERGENCY INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER [15]

This employment case is brought by *pro se* Plaintiff John Roseman ("Roseman") against his employer, Defendant FCA US LLC ("FCA"), and his union, Defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"). Roseman filed his complaint on September 28, 2018, and filed an amended complaint on October 15, 2018. (Docs. #1, #9). He brings forth multiple employment-related claims against Defendants, including violations of the Age Discrimination in Employment Act of 1967, the Civil Rights Act of 1964, and intentional infliction of emotional distress, among others. (Doc. #9). Presently before the Court for a Report and

Recommendation[1] is Roseman's Motion for Emergency Injunctive Relief and Temporary Restraining Order ("TRO Motion"), which he filed on November 2, 2018. (Doc. #15). FCA filed a response on November 5, 2018, and Roseman filed a reply on November 7, 2018. (Docs. #19, #20). The Court held oral argument on this matter on November 13, 2018. For the reasons discussed below, Roseman's TRO Motion should be denied.

## I.    REPORT

### a. Background

Roseman is a twenty-year employee of FCA, and is currently assigned to its Sterling Heights Assembly Plant location. Starting on July 26, 2018, he went on paid leave from FCA, having stopped work on that date as a result of an incident with a co-worker named Dominick Amond ("Amond"). More specifically, Roseman alleges that Amond harassed him by making various remarks about him, sending various text messages to other work colleagues about Roseman, and by interfering with Roseman's ability to perform his work functions.[2]  For instance, Roseman

---

[1] On October 18, 2018, this case was referred to the undersigned for management, hearing, and determination of all pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A), and for any reports and recommendations on dispositive matters that may be necessary pursuant to 28 U.S.C. § 636(b)(1)(B). (Doc. #12).

[2] Although Roseman alleges, for example, that Amond's conduct "interfered with his ability to do his work" (Doc. #9 at 22), at the hearing, Roseman admitted that his supervisors have not complained about his work.

complains that "Amond once told Plaintiff, your pay rate is higher than mine and 'I have a serious problem with that.'"  (Doc. #9 at 4, ¶ 9).  The following are a few examples of Amond's allegedly "threatening" text messages: "Stay woke everyone john [Roseman, presumably] the reason we all having a meeting and finna [sic] get watched masking.  By Jana."; "Remember every be on time y'all kno [sic] who made it hot up there so stay woke."  (Doc. #9 at 80, 82).  Roseman complained about Amond to an FCA superior, Jana Hall, and while she did initially express some concern for Roseman, ultimately, she indicated that FCA investigated the dispute and determined that Amond's conduct was not "aggressive" and did not warrant further action.  (Doc. #15 at 8-9).  Roseman contends that the dispute between he and Amond caused him to suffer so much stress that he had to stop working.

On October 22, 2018, Sedgwick, the "third-party administrator" of FCA's Disability Evaluation Program ("DEP"), advised Roseman that he would be required to undergo an independent medical examination, performed by Neil Talon, M.D., to determine his fitness to work.  (Doc. #15 at 25).  Sedgwick advised that, pursuant to FCA's DEP, Dr. Talon's decision would be "final and binding."  (*Id.*).  Roseman underwent that examination on October 30, 2018, and Dr. Talon determined that he could return to work without restrictions.  On November 1, 2018, Sedgwick wrote to Roseman, advised him of Dr. Talon's decision, and instructed him to report to his "local Human Resource/Employment office for an evaluation prior to [his] next

scheduled shift." (Doc. #23 at 3). Roseman was also advised that if he failed to report as instructed, "[his] eligibility for HealthCare will cease the first of the month following the month of the date of this exam." (*Id.*).

Roseman disputes the validity of Dr. Talon's determination, and asserts that Dr. Talon was rude to him and refused to review records that Roseman brought with him to the IME, and had "no intentions on rendering an objective, ethical, or 'appropriate' decision." (Doc. #20 at 2, 15). In his TRO Motion, Roseman asserts that it would subject him to "imminent danger of physical, mental and medical problems" if he were required to return – as FCA has instructed – to the allegedly "hostile work environment" that awaits him at his FCA duty location. (Doc. #15 at ¶¶ 9-10, 16).[3] Roseman asks the Court to enter an order requiring FCA and its agents and employees to (1) "immediately cease harassment of [him] and interference with his prescribed medical treatment"; (2) "immediately cease it's [sic] outrageous, perfunctory, and unusually negligent behavior in trying to induce [him] to return to

---

[3] At the hearing, Roseman noted that his complaints against FCA relate not only to the situation with Amond, but how FCA has allegedly allowed a hostile work environment to exist over the years. While it is true that Roseman's amended complaint includes allegations of workplace disputes (which he characterizes as "harassment") dating back years (*see, e.g.*, Doc. #9 at 60-69), the crux of his amended complaint, and certainly of his claimed need for immediate injunctive relief, relates to his recent dispute with Amond. (*See, e.g.*, *id.* at 3-10, ¶¶ 7-24, 28-30). In the days leading up to the hearing in this matter, FCA offered for Roseman to return to his duty station with Amond being transferred elsewhere so the two would no longer work together. Roseman declined that offer.

a hostile work environment"; and (3) "discontinue threatening to discharge [him] for not returning to a hostile work environment cultivated by Defendants FCA [] and UAW." (Doc. #15 at ¶¶ 14-16).

In its response brief, FCA characterizes Roseman's TRO Motion as an attempt to "extend his workers' compensation leave when FCA[]'s third-party administrator, Sedgwick, has concluded that Roseman should return to work after an independent medical examination." (Doc. #19 at 7). In his reply brief, Roseman disputes FCA's assertion that he is on a "workers' compensation leave." (Doc. #20 at 2). Indeed, Roseman seems to blame FCA for the fact that he is not on a workers' compensation leave, asserting, "Plaintiff is not on a workers' compensation leave because Defendant FCA Disputed Plaintiff's claim with the Michigan Department of Licensing and Regulatory Affairs Workers' Compensation Agency, asserting that 'injury not work related' . . ." (*Id.*).[4] Attached to Roseman's reply is a letter dated November 6, 2018, from his own doctor, Rima Abbas, M.D., in which she writes that she saw Roseman that day, and that "It is not recommended that he returns to

---

[4] At oral argument, it was clarified that Roseman initially was on a worker's compensation leave, but that presently he is on a "sickness and accident leave." Regardless, there is no dispute that Roseman has been on paid leave virtually the entire time since he stopped working on July 26, 2018. Moreover, Roseman remains an employee of FCA, though, at this point, if he fails to report as directed, he risks being issued a "five-day" letter, giving him five days to return to work after which time FCA could terminate his employment.

the facility where he was working, which caused his current Mental health issues to develop." (*Id.* at 17).

### b. Legal Standards

"Temporary restraining orders and preliminary injunctions are extraordinary remedies designed to preserve the relative positions of the parties until further proceedings on the merits can be held." *Koetje v. Norton*, 2013 WL 8475802, at *2 (E.D. Mich. Oct. 23, 2013). Whether to grant such relief is a matter within the discretion of the district court. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). The movant bears a substantial burden of demonstrating entitlement to preliminary injunctive relief. *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Such relief should be granted only if "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

The same factors are considered in determining whether to grant a request for a temporary restraining order ("TRO") or a preliminary injunction. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Those factors are: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the public

interest is served by issuance of the injunction.  *See Overstreet*, *supra* at 573.

### c. Analysis

#### i. Roseman Failed to Show He Will Suffer Irreparable Injury Absent the Requested Injunction

An analysis of the above-mentioned factors shows that Roseman is not entitled to a temporary restraining order, or emergency injunctive relief.  Most significantly, Roseman fails to show that he will suffer any irreparable harm if his TRO Motion is denied.  "[T]he moving party must show that irreparable harm is 'both certain and immediate, rather than speculative or theoretical.'"  *Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013) (citing *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 154 (6th Cir. 1991)).  Roseman has failed to meet this high standard, as he has not explained what specific harm he faces if he were to return to work as requested by FCA, and why any alleged harm is both certain and immediate.

In his TRO Motion, Roseman alleges that he "fears for his personal safety due to a hostile work environment and is in imminent danger of physical, mental, and medical problems."  (Doc. #15 at 3).  However, these allegations fail to satisfy Roseman's heavy burden because he does not explain in any detail what specific "imminent" physical, mental, or medical harm will befall him without emergency relief.  First, in neither Roseman's TRO Motion nor his amended complaint does he identify any specific physical danger he faces, let alone any facts providing a basis

7

for that belief.  Roseman argues that certain of his conversations with, and text messages from, Amond show the harm and harassment he may face.  But, a review of the allegations and text messages does not support Roseman's subjective view.[5] Most of the allegations Roseman levels at Amond can be described as Amond simply making remarks critical of Roseman.  For example, Roseman alleges that "Amond once told [him], your pay rate is higher than mine and 'I seriously have a problem with that.'"  (Doc. #9 at 4, ¶ 9).  Roseman also alleges that Amond texted other workers: "Stay woke everyone john [Roseman, presumably] the reason we all having a meeting and finna [sic] get watched masking . . ." and "Remember every be on time y'all kno [sic] who made it hot up there so stay woke."  (Doc. #9 at 80, 82). While these allegations reflect a dispute between Amond and Roseman, or even perhaps Amond's dislike of Roseman or his work style, the messages do not threaten any violence against Roseman.

---

[5] At the hearing, Roseman argued that his subjective view (*i.e.*, that he honestly feels threatened) should be sufficient to establish irreparable harm.  That argument lacks merit as it would turn the high standard for securing a temporary restraining order on its head, and require one to issue any time a plaintiff simply claimed to feel "threatened."  As discussed above, Roseman was required to make a strong showing "that irreparable harm is 'both certain and immediate, rather than speculative or theoretical.'"  *Contech*, 931 F. Supp. 2d at 818).  *See also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675–76 (9th Cir. 1988) ("Subjective apprehensions and unsupported predictions of revenue loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm."); *Enyart v. Ohio Dep't of Rehab. & Correction*, No. 2:16-CV-00161, 2016 WL 5266476, at *3 (S.D. Ohio Sept. 22, 2016) (upholding denial of TRO motion where "Plaintiff failed to offer any *objective evidence* of a specific threat to his safety . . .") (emphasis added).

Roseman does allege that in February 2018, there was a "well publicized arrangement [for Amond] to fight a co-worker," and that at some prior point in time, Roseman witnessed Amond "repeatedly make offers to another co-worker, Jacques Burrell, to put a 'hit' out on [another individual] . . ." (Doc. #9 at 4, ¶ 9; *id.* at 30-31, ¶ 48). While the second allegation, in particular, is alarming, neither one changes the analysis here. As to the first, Roseman does not allege that a fight ever took place, and it was to have been between Amond and another individual, at any rate. As to the second, far more serious allegation, Roseman admits that, despite having voiced numerous less significant concerns about Amond to FCA, he never raised this issue. (Doc. #9 at 30-31, ¶ 48) ("Plaintiff could have advised FCA . . ."). Moreover, he offers no corroborating proof of Amond's alleged statement. Finally, as noted above, *supra* at 4 n.3, FCA has offered to remove Amond from Roseman's duty station, yet Roseman still refuses to return to work.

The Court recognizes that on November 6, 2018, Roseman saw his treating physician, Dr. Rima A. Abbas, M.D., who provided a letter stating, "This is to certify that John L. Roseman was seen in my clinic on 11/6/2018. It is not recommended that he returns to the facility where he was working, which caused his current Mental health issues to develop." (Doc. #20 at 17) Yet this is only a recommendation, and Dr. Abbas provides no details whatsoever as to its basis, duration, or whether it is absolute or subject to change if circumstances at Roseman's duty station changed,

such as FCA's transferring of Amond elsewhere.  Accordingly, Dr. Abbas' recent letter does not establish that Roseman will face irreparable injury if he were to return to his duty station.[6]

Further, "of critical importance, the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff." *Contech*, 931 F. Supp. 2d at 818 (internal citations omitted).  Roseman neglects to mention any attempt to utilize alternate remedies to address these workplace issues, or why they would be inadequate.  As FCA persuasively argues, alternative remedies are already in place, as it "has policies and procedures to address those threats and protect [Roseman]."  (Doc. #19 at 27).[7]  And, if Roseman chooses not to avail

---

[6] The few other medical records attached to Roseman's complaint similarly do not show that he would face imminent, irreparable medical harm if he were to return to work.  (Doc. #9-1).  The first letter, dated July 30, 2018, and signed by "Jamie L Fineran, NP" states merely, "[Roseman] was seen in the office today.  He was diagnosed with anxiety."  (*Id.* at 2).  But, the mere diagnosis of a medical condition says nothing about any particular restrictions on Roseman's activities, employment or otherwise.  The second letter, dated September 14, 2018, and signed by Dr. Abbas merely states, "[] Roseman was seen in my clinic.  He needs to be off until 10/5/18 or until further notice."  (*Id.* at 4).  The third letter, dated August 3, 2018, and signed by "Jamie L Fineran, NP," states, "It is my medical opinion that John Roseman will be unable to return to work due acute anxiety caused by a hostile work environment."  (*Id.* at 5).  But Fineran is a nurse practitioner who is subordinate to Dr. Abbas at Beaumont, and Fineran's now three-month-old note contains no details whatsoever as to the cause of Roseman's "acute anxiety" or his need for an indefinite work restriction.

[7] While Roseman may dispute the efficacy of these procedures, he cannot deny their availability to him.  Indeed, his filings contain numerous references to his making "EthicsPoint" and other informal complaints and grievances about work-related

himself of those procedures and prevails on his claims, he can be made whole through monetary damages. This, too, weighs heavily against his claim of irreparable harm. *See Contech*, 931 F. Supp. 2d at 817 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *Overstreet*, 305 F.3d at 573 (finding that if money damages can compensate a plaintiff's harm, then the harm is not irreparable and a preliminary injunction is not warranted).

In sum, Roseman failed to show that returning to work in the same setting as Amond would subject him to physical danger or other injury. *Capital for Merchants, L.L.C. v. Wealth Creating Investments*, No. 16-13610, 2016 WL 9280075, at *2 (E.D. Mich. Oct. 13, 2016) (denying motion for temporary injunctive relief where plaintiff's "claims of irreparable harm are [] too conclusory to grant any type of injunctive relief"); *Kensu v. Rapelje*, No. 12-11877, 2014 WL 1028948, at *4 (E.D. Mich. Mar. 14, 2014) ("This Court cannot grant a preliminary injunction based on conclusory statements alone and needs evidence" that the plaintiff will suffer irreparable harm absent an injunction). Moreover, if this were truly Roseman's concern, FCA gave him the opportunity to remedy it by offering to transfer Amond

---

issues, and them being considered and investigated by FCA. (*See e.g.*, Doc. #15 at 8-9, 17-23).

to a different duty station.  Indeed, given the nature of Roseman's TRO Motion, it is not clear what other concrete action he would want FCA to take.  Finally, if Roseman does not return to work and prevails on his claims (an outcome which seems unlikely for the reasons discussed below), his losses could be adequately compensated with money damages.  Because Roseman cannot show that he will suffer irreparable injury in the absence of the requested TRO, his TRO Motion should be denied.

### ii. Roseman Failed to Show a Strong Likelihood of Success on the Merits of His Claims

Because Roseman cannot show irreparable injury in the absence of the requested temporary restraining order, the Court need not delve too deeply into the merits of his claims.  However, even a cursory review of Roseman's allegations suggests that his likelihood of success on the merits is weak.  For instance, whereas Roseman stakes his intentional infliction of emotional distress ("IIED") claim on the conversations and text messages described above, the law seems clear that much more is required.  Under Michigan law, the elements of a claim for IIED are (1) extreme or outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.  *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577 (2004).  In order to sustain a claim of IIED, a plaintiff must complain of conduct that meets a particularly high standard:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized

12

> by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Ross v. Burns*, 612 F.2d 271, 273 (6th Cir. 1980).  Importantly, "[i]nsults, indignities, threats, annoyances, or petty oppressions are insufficient as a matter of law to be considered extreme and outrageous conduct."  *Graham v. Ford*, 237 Mich. App. 670, 675.  Courts have found that conduct far more severe than that complained about by Roseman did not support an IIED claim.  For example, in *Hilden v. Hurley Med. Ctr.*, 831 F. Supp. 2d 1024, 1047 (E.D. Mich. 2011), aff'd, 504 F. App'x 408 (6th Cir. 2012), the court dismissed an IIED claim brought against an employer who allegedly chased an employee through the halls of a hospital while shouting and yelling.  *Id.*  In *Meek v. Michigan Bell Tel. Co.*, 193 Mich. App. 340, 342-343 (1991), the court dismissed an IIED claim arising from workplace bullying that allegedly involved extensive sexual and religious harassment, in addition to persistent threats of discipline, insults about the quality of the plaintiff's work, and slurs relating to her physical stature.  Because Roseman has not alleged conduct which reasonably

can be characterized as "extreme and outrageous" under the law, his IIED claim seems likely to fail on the merits.[8]

Roseman's discrimination claims seem to face an equally uphill battle. Because Roseman proffers no direct evidence of discrimination, he must prove each element of his *prima facie* case for discrimination claims pursuant to Title VII and the Age Discrimination in Employment Act as follows: (1) he is a member of a protected group; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) circumstances giving rise to an inference of discrimination (*i.e.*, he was replaced by a person outside the protected class or similarly situated employees outside the protected category were treated more

---

[8] For essentially the same reasons, Roseman has not shown a strong likelihood of success on the merits of his claims for hostile work environment or negligent retention of Amond. As to the former claim, while it is unclear whether Roseman ties his claim to race, gender, age, or some other protected class discrimination, he must show, in any case, unwelcome conduct that was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *See e.g.*, *Williams v. CSX Trans. Co.*, 643 F.3d 502, 511 (6th Cir.2011). Factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Similarly, to succeed on a negligent retention claim, Roseman must show that he suffered actual or threatened harm as a result of an intentional tort that FCA knew or should have known was likely to occur. *Brown v. Brown*, 478 Mich. 545, 555-57 (2007). While Roseman's interactions with Amond perhaps suggest a strained work relationship between the two, Roseman admits that he has been able to do his work to his supervisors' satisfaction, and he does not allege that Amond ever threatened to, or did, assault him. In short, Roseman's allegations simply do not appear to rise to the level required for him to succeed on these claims.

favorably).  *Vincent v. Brewer Company*, 514 F.3d 489, 494 (6th Cir. 2007) (citing

*Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).  Roseman seems unlikely

to satisfy these requirements.

First, Roseman was still employed at FCA when he commenced this action

(and indeed, remains employed there even today).  It is therefore unclear what

cognizable adverse employment action he has allegedly suffered.  Second, Roseman

seems unable to show an inference of discrimination by FCA.  Although he alleges

he is a member of various protected classes, such as his race (African American),

sex (male), and age (40), in most all respects he fails to make allegations as to how

others from different protected classes were treated differently than he was.  The

sole exception is with respect to his allegation that a female employee, Kyanne

Gaddis, was treated differently than him because, after she complained about Amond

allegedly threatening her, she was transferred "from 'B' shift to 'C' for her

protection," whereas Roseman was required to continue working with Amond.

(Doc. #9 at 6, ¶ 17).  However, even as to this issue, Roseman offers only his own

uncorroborated allegations, and fails to provide details from which the Court could

conclude that he and Gaddis were similarly situated with respect to their experiences

at FCA.  Accordingly, he has not shown a strong likelihood of success on these

claims.

Nor has Roseman shown a strong likelihood of success on his retaliation claim. It is unclear whether Roseman intends to base that claim on the "discipline" he received for posting flyers in the workplace that FCA deemed to be threatening because they apparently included a picture of himself holding a rifle (*see* Doc. #19 at 9), or if he is alleging retaliation due to his allegedly having reported racial discrimination (*see* Doc. #9 at 19, ¶ 82). Regardless, Roseman will be required to show that he suffered an adverse action that was motivated, at least in part, by his protected conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Thaddeus–X v. Blatter*, 175 F.3d 378, 395–99 (6th Cir.1999) (*en banc*). However, in addition to not having suffered any adverse action, Roseman has presented no evidence (or even specific allegation) suggesting a causal connection between his protected activity and the alleged retaliation. Accordingly, he has not shown a strong likelihood of success on his retaliation claim.

Finally, Roseman has not shown a likelihood of success on his libel claim, which he appears to plead as a defamation claim. (Doc. #9 at 31-32). To succeed on such a claim, Roseman must prove: 1) a false and defamatory statement concerning him; 2) an unprivileged communication to a third party; 3) fault amounting to at least negligence on the part of the publisher; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Burden v. Elias Bros. Big Boy Restaurants*, 240

Mich.App. 723, 726 (2000). Roseman's claim relates to the written discipline he received in connection with the flyer he posted in the workplace which included a picture of him with a rifle. (Doc. #9 at 31, 42-58). However, Roseman has not shown that the discipline he received was unwarranted, or that anything written in the discipline record was untrue, defamatory, or negligently authored. Nor has Roseman shown that he suffered any injury as a result of the discipline. For all of these reasons, he has not shown a strong likelihood of success on this claim.

In sum, Roseman has not shown that he will suffer irreparable injury in the absence of the requested injunctive relief. Nor has he shown that he has a strong likelihood of success on the merits. This sufficiently establishes that Roseman is not entitled to the extreme injunctive relief he requests, and that his instant TRO Motion should be denied.[9]

## II. RECOMMENDATION

For the foregoing reasons, **IT IS RECOMMENDED** that Roseman's Motion for Emergency Injunctive Relief and Temporary Restraining Order (**Doc. #15**) be **DENIED**.

Dated: November 16, 2018           s/David R. Grand
Ann Arbor, Michigan              DAVID R. GRAND
                                United States Magistrate Judge

---

[9] Accordingly, the Court declines to consider the other *Overstreet* factors discussed above.

17

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 16, 2018.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
