UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN L. ROSEMAN

                Plaintiff,           Civil Action No. 18-cv-13042
                                          Honorable David M. Lawson
                                          Magistrate Judge David R. Grand

v.

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW),
FCA US, LLC, UAW LOCAL 1700, and
UAW LOCAL 140,

                Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT FCA AND UNION DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [87, 89, 90, 91] AND TO DENY PLAINTIFF JOHN ROSEMAN'S MOTIONS FOR SUMMARY JUDGMENT [77, 78]

Plaintiff John Roseman ("Roseman") brings this action against his (now) former employer FCA US LLC ("FCA"), as well as the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "International Union") and two local UAW unions, UAW Local 140 and UAW Local 1700 (collectively, the "Union Defendants"). The case arises out of relatively minor disputes Roseman had with certain of his coworkers and the manner in which FCA and union representatives handled those disputes. Roseman took a lengthy medical leave as a result of the stress these incidents allegedly caused him. While he was on leave, Roseman commenced this action. Eventually, a physician conducted an independent medical examination and approved Roseman to return to work without restrictions. FCA even offered to transfer the co-worker with whom Roseman had the most significant and most recent disputes to a different department so that Roseman would not need to work with him. When Roseman still

refused to return to work, FCA terminated his employment.

In his operative second amended complaint, which Roseman filed after his termination, he asserts the following claims: 1) age discrimination and hostile work environment in violation of the Age Discrimination in Employment Act ("ADEA") (Count I); 2) gender discrimination and hostile work environment in violation of Michigan's Elliott-Larsen Civil Rights Act ("ECLRA") (Count II); 3) retaliation in violation of the ELCRA (Count III); 4) race discrimination in violation of the ELCRA (Count IV); 5) civil conspiracy, hostile work environment (Count V); 6) breach of duty of fair representation (Counts VI, VII, VIII); 7) intentional infliction of emotional distress (Count IX); 8) negligent retention of an unfit employee (Count X); 9) libel (Count XI); 10) breach of contract (Count XII); and 11) infringement upon his Second Amendment right to bear arms (Count XIII). (ECF No. 40.)

On November 14, 2019, Roseman filed a motion for partial summary judgment against UAW Local 1700 as to his breach of the duty of fair representation claim. (ECF No. 77.) On November 26, 2019, Roseman filed a motion for partial summary judgment against FCA as to his intentional infliction of emotional distress claim. (ECF No. 78.) On December 13, 2019, Roseman filed a third motion for partial summary judgment, which was stricken pursuant to court order. (ECF Nos. 85, 86.) The Defendants then filed their respective motions for summary judgment. (ECF Nos. 87, 89, 90, 91.) Roseman has filed several responses and Defendants have likewise replied. (ECF Nos. 88, 92, 93, 94, 95, 96, 99, 100, 101.) This case was referred to the undersigned for all pretrial matters under 28 U.S.C. § 636(b). (ECF No. 12.) Having reviewed the pleadings and other papers on file, the Court finds that the facts and legal issues are adequately presented in the parties' briefs and on the record, and it declines to order a hearing at this time.

For the reasons set forth below, it is **RECOMMENDED** that the Defendants' motions for

summary judgment **(ECF Nos. 87, 89, 90, 91)** be **GRANTED** and that Roseman's motions for summary judgment **(ECF Nos. 77, 78)** be **DENIED**.

## I.    REPORT

### A.    Facts

Roseman began working at FCA in July 1998 as an assembler at the Warren Truck Assembly Plant ("WTAP").   (ECF No. 40, PageID.600; ECF No. 87-2, PageID.2325.)   He subsequently held the position of Team Lead.   (ECF No. 87-2, PageID.2329.)   UAW Local 140 represented him at WTAP.   (*Id*.)   Around January 2018, Roseman transferred to FCA's Sterling Heights Assembly Plant ("SHAP"), where he worked as a team member in assembly and at the paint shop.   (ECF No. 40, PageID.600.)   UAW Local 1700 represented him at SHAP.   Roseman's allegations arise from three incidents that occurred during his tenure in these positions.

#### *1. Co-Worker Darlene Ark Incident*

In November 2016, Roseman complained of harassment and hostility by co-worker Darlene Ark.   (ECF No. 40, PageID.600.)   At the time, Roseman was a Team Leader.   (ECF No. 87-2, PageID.2329.)   According to Roseman, Ark failed to properly execute an operation on the assembly line.   (ECF No. 40-1, PageID.651.)   Supervisor Herbert Wright asked Ark and Roseman to explain the failure.   (*See id*.)   Ark answered by swearing at Roseman, and stating that he needed "to get some balls." (ECF 40-1, PageID.652.)   Wright took over Roseman's Team Leader responsibilities, and Roseman resumed his duties on a separate line from Ark.   (*Id*. at PageID.656.)

FCA investigated this incident and suspended Ark on November 5, 2016.   (*Id*. at PageID.652.)   Ark returned to work on November 15, 2016.   (*Id*.)   Dissatisfied with FCA's disciplinary action, Roseman made several complaints to Wright and FCA Labor Representative, Cynthia Jones.   (*Id*.)   He also filed a grievance on November 25, 2016 (*Id*. at PageID.652-53), and

hired an attorney. (*Id*. at PageID.649.)

On December 1, 2016, attorney Sandra Hanshaw Burink sent a demand letter to FCA, on Roseman's behalf, requesting further investigation of Ark's behavior. (*Id*. at PageID.649.) FCA retained outside counsel, Deborah Brouwer ("Brouwer"), to investigate Roseman's complaints. (ECF No. 87-2, PageID.2329.) Brouwer did not recommend any further discipline as a result of her investigation, and Roseman indicated he was satisfied with FCA's actions. (*Id*.)

### 2. *The Union Election Flyers Incident*

In March 2018, Roseman ran for UAW Local 1700 union steward. (ECF No. 87-2, PageID.2330.) As a part of his campaign, he posted flyers throughout the plant that depicted him holding a rifle and asking, "Is it time for a new sheriff[?]" (ECF No. 40-1, PageID.734-35.) FCA Labor Relations contacted UAW Local 1700 Shop Committeeman Michael Spencer ("Spencer") regarding these flyers and requested that they be removed. (ECF No. 90-16, PageID.2575-76.) Spencer subsequently advised Roseman to remove the flyers, and Roseman claims he did so. (ECF No. 87-2, PageID.2332.)

On March 7, 2018, when Roseman reported to work, he found that his access badge did not work, and he could not enter the plant. (ECF No. 87-2, PageID.2330.) The next day, Local 1700 Union Stewards Eddie Smith ("Smith") and Michael Caldwell ("Caldwell") met Roseman in the lobby and escorted him to an investigatory meeting with FCA management regarding the flyers. (*Id.; see also*, ECF No. 90-15, PageID.2564.)

Roseman, Smith, Caldwell, and FCA Labor Relations Representatives Cynthia Johnson ("Johnson") and Corey Scott ("Scott") attended the meeting. (ECF No. 90-15, PageID.2564.) Johnson and Scott told Roseman that FCA determined that his flyers violated work rules against threatening, intimidating, coercing or harassing conduct. (*Id*; *see also*, ECF 40-1, PageID.641.)

Johnson and Scott proposed a wide range of disciplinary actions for Roseman's refusal to remove the flyers, including termination and suspension.  (*Id*. at PageID.2565.)  Smith and Caldwell argued that termination and suspension would be disproportionate to Roseman's conduct.  (*Id*.)  Smith argued that a reasonable resolution would be a verbal warning.  FCA ultimately agreed, and asked Roseman to sign the verbal warning.  (*Id*. at PageID.2565.)  The verbal warning stated:

> John Roseman, CID 1041863, displayed a bulletin in various work locations that displayed him with a rifle, with the notation on the bulletin, "new sheriff in town.  [sic] The bulletin is considered to be inappropriate for the workplace.

(ECF No. 40-1, PageID.641.)

Roseman refused to sign this warning, which resulted in Johnson indicating she was going to complete a Notice of Suspension, Disciplinary Layoff or Discharge for Roseman.  (*Id;* ECF 90-3, PageID.2512; ECF No. 90-15, PageID.2565.)  Smith again argued that suspending Roseman would be inappropriate.  (ECF No. 90-15, PageID.2565.)  Johnson agreed to forgo suspending Roseman and instead simply gave him the unsigned verbal warning.  (*Id*.)  Roseman was still dissatisfied with the verbal warning, but Smith "told [him] this was the best the union would be able to do and that the matter was resolved."  (ECF No. 90-15, PageID.2565.)

On March 9, 2018, Roseman sent Spencer an e-mail complaining about his treatment on the previous day when he could not initially enter the building, stating that he was "detained by FCA human resources, security, and labor relations at 4:20 P.M. without access to water or restroom."  (ECF No. 40-1, PageID.634-35.)  Spencer responded by e-mail, asking whether Roseman actually asked for water or a restroom.  (*Id*.)  Roseman stated he did not because there was nobody in the lobby to ask, but he did not complain about lack of access to water or a restroom at the meeting that occurred shortly after this alleged incident.  (*Id.*; ECF No. 90-15, PageID.2565.)

On March 11, 2018, Roseman sent Spencer another e-mail requesting that his verbal

warning be grieved and demanding a public apology:

## Factual Background

1. John Roseman posted flyers/printed material in a campaign to run for the position of UAW UNION STEWARD, District 21 of Local 1700.
2. No flyer, "bulletin", or any other printed material Employee John Roseman (1041863) posted in Sterling Heights Assembly Plant a FCA facilaty [sic] contained the declaration or phrase or declaration "new sheriff in town" alleged in the verbal warning.
3. The signatures of FCA and UAW officials on this document constitute fraud and is [sic] a material misrepresentation.
4. The signature of the Union Official represents a breach of duty and a failure to represent Mr. John Roseman an FCA employee of 20 years fairly.
5. Mr. John Roseman [sic] rights have been violated.
6. It is reasonable to deduce from the context of this FCA Displinary [sic] Action that the motivation is and was political.
7. Mr. John Roseman feels he was being harassed, coerced and intimidated by FCA and UAW officials to accept and sign off on what he believed to be unjust Disciplinary Action.
8. The "VIOLATION TYPE" that FCA alleges is a false acusation. [sic] No ACTIONS or WORDS in any printed material, bulletin or flyer posted or produced by John Roseman can REASONBLY [sic] be deduced to being:   THREATENING, INTIMIDATING, COERCING, or HARASSING
9. It is reckless, extreme and outrageous for FCA and UAW officials to collude in this damaging act of defamation and material misrepresentation.

## Relief Sought

Mr. John Roseman request [sic] that his UAW steward grieves the Disciplinary Action (below/next page).

A public apology from FCA and UAW officials.   Disciplinary Action removed from Mr. John Roseman's work record.

(ECF No. 40-1, PageID.639-640.)

On March 17, 2018, Roseman sent Spencer another e-mail asking about this grievance. (ECF No. 40-1, PageID.643.)  Because "Smith had explained to Mr. Roseman that the matter was resolved," Spencer declined to pursue a grievance.  (ECF No. 90-16, PageID.2576-77.)  Despite

these disputes, Roseman continued working in his position.

### 3. The Dominic Amond Dispute

In late July 2018, Roseman began having issues with co-worker Dominic Amond ("Amond") while Roseman was filling in as Team Leader for Keith Hall ("Hall"), a co-worker and union steward. (ECF No. 40, PageID.601; ECF No. 90-15, PageID.2567.)  On July 25, 2018, Amond sent a text message to various co-workers, saying, "I guess since we got a new [team leader] for this week it comes with new rules and micro management [sic]."  (ECF No. 40-1, PageID.665.)  According to Roseman, Amond criticized Roseman's decision to follow management's orders to allocate additional manpower to the line that Roseman and Amond were working on. (ECF No. 40, PageID.601.)  Roseman alleges that Amond "intimidated and prevented Roseman from performing his duty" because Amond would not allow other employees to work in his space.  (*Id*.)  Lastly, according to Roseman, Amond "unintelligibly rant[ed] about Roseman" and "commence[ed] to lash out at Roseman."  (*Id*.)

On July 26, 2018, Amond continued to criticize Roseman on the same group text, saying, "[s]tay woke everyone john [sic] the reason we all having a meeting and finna get watched masking," and "[r]emember every [sic] be on time y'all kno [sic] who made it hot up there so stay woke."  (ECF No. 40-1, PageID.669-671.)  Roseman sent an e-mail to FCA Supervisors Julian Brunson ("Brunson") and Jana Hines ("Hines") attaching screenshots of these messages.  (ECF No. 40-1, PageID.630.)  Hines told Roseman to go to human resources with his complaints and said, "[n]o one should have to work like this."  (ECF No. 40, PageID.602.)  Later in his shift, Roseman met with Hines and Hall.  (ECF No. 87-2, PageID.2336.)  Hines expressed her displeasure with Amond and suggested Amond would be immediately removed from the area and disciplined. (ECF No. 40, PageID.604.)  According to Roseman, Hall expressed reservations about

7

disciplining Amond, stating that he did not want to deal with Cynthia Johnson because he had recently lost a battle with her over another employee. (*Id.*) According to Roseman, Hall ultimately relented and agreed that Amond should be disciplined and removed from the "team." (*Id.*) Roseman then returned to work.

Later that day, Roseman was allegedly "traumatized and immensely distressed" to see Amond still working, and allegedly staring at Roseman with a "grim, unflinching and negative look on his face." (*Id.* at PageID.605-06.) Roseman met with Hall again at 1:00 a.m. (*Id.*; ECF No. 87-2, PageID.2348.) Hall explained to Roseman that he had spoken with Amond about Amond's texts and statements to Roseman, and told him they were serious issues that could result in his termination. (ECF No. 40, PageID.606.) Hall also said that he told Amond, "John's an OLD HEAD." (*Id.*) Hall also told Roseman that Amond would not be disciplined. (*Id.*) Roseman did not return to work after his shift ended that morning, alleging it was too stressful. (*Id.*)

Roseman was placed on medical leave. About three months later, on October 30, 2018, Dr. Neil S. Talon, M.D. completed an independent medical examination ("IME") of Roseman to assess his ability to return to work. (ECF No. 40-1, Page.ID.701-704.) Dr. Talon concluded that Roseman could return to work without restrictions. (*Id.*) Dr. Talon found that Roseman was "able to go back to work psychiatrically on full work duty," though Dr. Talon did note that Roseman's "problem with the other coworker" was "more of a legal or human resources issue." (*Id.*, PageID.704). Consequently, on November 1, 2018, FCA sent Roseman a letter instructing him to return to work by November 21, 2018. (ECF 87-5, PageID.2357.)[1] Roseman took issue with Dr.

---

[1] Roseman was also advised that FCA's "insurance program provides that the results of the evaluation are final and binding. Therefore Sickness and Accident (S&A) benefits, if otherwise payable, will not be paid beyond the date of your evaluation. . . . You are entitled to a review of this benefit determination if you do not agree. A request for review must be made to the FCA Service Center within 60 days following receipt of this letter. Provide any additional material and

Talon's assessment, principally because he "would have been going right back to work with Amond in the same work area." (ECF No. 87-2, PageID.2339-40). But FCA was willing to address that concern; on November 9, 2018, FCA sent Roseman an e-mail stating, "The plant would like to return you to work to your same job – same department and position. They will be moving Mr. Amond to [a] different department, so that you will not have to work with him." (ECF 87-6, PageID.2359.) Roseman simply responded, "Thank you, but sorry, I can't do that." (*Id.*).

Thus, Roseman did not return to work. (*Id.*; ECF No. 87-2, PageID.2338.) On November 13, 2018, at a hearing before this Court on Roseman's motion for temporary restraining order, FCA again offered Roseman his job back. (ECF No. 32, Page.ID.461.) Roseman continued to refuse this offer. (*Id.*) Because of his refusal to return to work, on December 3, 2018, FCA terminated Roseman's employment. (ECF No. 87-3, PageID.2351.)

On January 12, 2019, Roseman e-mailed his union representatives, asking that the union file a grievance on his behalf related to his termination. (ECF No. 92-6, PageID.2728-29). Specifically, he wrote that he "did not agree with the findings of Dr. Neil Talon . . . I want the exam challenged because exam did not conform to standards for such examinations . . . Namely, Dr. Talon refused to review additional relevant medical information that I brought to exam . . . In essence, I feel the IME was flawed, biased and negligent in that its recommendation for me to immediately report back to work put my health in undue risk." (*Id.*, PageID.2729.)[2] Roseman's

---

information you would like to have considered." (ECF 87-5, PageID.2357) Roseman e-mailed FCA's insurance benefits administrator, Sedgwick, on November 2 and 3, 2018, complaining about the manner in which Dr. Talon conducted the IME. (ECF No. 40-1, PageID.699-700).

[2] Roseman relies on a nurse practitioner note dated August 3, 2018 – almost three whole months before the IME – which simply states, "It is my medical opinion that John Roseman will be unable to return to work due [sic] acute anxiety caused by a hostile work environment." (ECF No. 92, PageID.2667; No. 9-1, PageID.218). However, the record also includes two notes from his doctor: in the first, dated September 14, 2018, the doctor wrote that Roseman "needs to be off until 10/5/18

9

union representative wrote back immediately, explaining to him that while a grievance would be filed, Roseman had acted too late, as the sixty-day window had "expired." (*Id.*, PageID.2728 (". . . you never indicated to me that you disagreed with the [IME] . . . A certified letter was sent out to [you] [] informing you to report back to work at which point if you had any concerns or disagreements with the evaluation you could have made them known once you reported and we would have requested a appeal to a IME . . . .) Nevertheless, the evidence before the Court is that Michael Spencer, a UAW Local 1700 representative, filed a grievance on Roseman's behalf challenging FCA's termination of his employment. (ECF No. 90-16, PageID.2578). As of the filing of UAW Local 1700's summary judgment motion, that grievance remained pending. (*Id.*).

## B. Applicable Legal Standards

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the

---

or until further notice," and in the second one, dated November 6, 2018, the doctor wrote, "It is not recommended that he return to the facility where he was working, which caused his current Mental health issues to develop." (ECF No. 40-1, PageID.731-32). Roseman presents no evidence that he supplied these notes to FCA prior to its decision to terminate him.

basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

Additionally, a moving party with the burden of persuasion who seeks summary judgment – here, Roseman – faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). The evidentiary showing must be so strong as to convince the Court that "no reasonable trier of fact could find other than for [the moving party]." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. "Accordingly, summary judgment in favor of the party with the burden of persuasion 'is inappropriate when the evidence

is susceptible to different interpretations or inferences by the trier of fact.'" *Green v. Tudor*, 685 F. Supp. 2d 678, 685 (W.D. Mich. 2010) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

### C.    Analysis

1.    *Defendants are Entitled to Summary Judgment on Roseman's Hostile Work Environment Claims under the ELCRA and ADEA*

Roseman alleges that he was subjected to a hostile work environment based on his age, sex, and race as a result of the three incidents described above, and FCA's and the Union Defendants' responses thereto: (1) Darlene Ark's comment to Roseman in 2016 that he needed "to get some balls"; (2) Roseman's posting of a union steward campaign flyer showing him holding a shotgun; and (3) Amond's texts and statements regarding Roseman's management, and Union Steward Hall's "old head" remark that followed.

To prevail on a hostile work environment claim, Roseman must show: (1) he belonged to a protected group; (2) was subject to communication or conduct on the basis of his protected status; (3) was subject to unwelcome conduct or communication involving his protected status; (4) the unwelcome conduct was intended to or did substantially interfere with his employment or created an intimidating, hostile, or offensive work environment; and (5) *respondeat superior*.  *Hester v. Department of Corrections*, No. 314572, 2014 WL 2536994, at *2 (Mich. Ct. App. June 5, 2014). "To determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citations omitted).  "The factfinder must evaluate the conduct at issue by both an objective and subjective standard," and that "requires a plaintiff to establish both that the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive." *Id.*  The Sixth Circuit has explained, "[c]onduct that is merely offensive is not actionable.  [] To be

12

actionable, the harassment must consist of more than words that simply have sexual [or ageist or racist] content or connotations." *Knox v. Neaton Auto Prod. Mfg., Inc.*, 375 F.3d 451, 459- 60 (holding that various comments and foul language were not severe or pervasive). *See also, e.g.*, *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017) (granting defendants summary judgment where several racially offensive statements were made over two years). Rather, the workplace must be permeated with "discriminatory intimidation, ridicule or insult" sufficiently severe or pervasive to alter the conditions of employment. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 65–67 (1986). Factors that courts consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006).

Defendants challenge Roseman's ability to meet multiple elements of his hostile work environment claims, but the Court will focus on the one most central to these claims – the "objective" element, which requires him to show that the challenged conduct was sufficiently "severe or pervasive" such that a "reasonable person" would say it created a hostile or abusive work environment. While Roseman may subjectively feel differently, there is no question that viewed objectively, the incidents about which Roseman complains simply do not, individually or collectively[3], show "severe or pervasive" harassment.

---

[3] In *Williams v. General Motors*, 187 F.3d 553, 562 (6th Cir. 1999), the Sixth Circuit explained that courts must not divide and categorize "the reported incidents [of harassment], divorcing them from their context and depriving them of their full force." At the same time, the "totality of the circumstances" test described in *Williams* necessarily includes consideration of the temporal proximity and other connections (or disconnects) between the various incidents. Roseman's dispute with Ark occurred in 2016, more than a year before the next incident about which he complained. It also occurred at a different facility. And, when asked at his deposition whether "the situation had been handled [by FCA] to [his] satisfaction," Roseman answered in the affirmative. (ECF No. 87-2, PageID.2329.) Thus, it is highly questionable whether the Ark

Here, the totality of the circumstances are that over a period of about two years, Roseman was subjected to a few isolated instances of conduct that no objective observer would deem to be "severe or pervasive" harassment.  First, Ark made a stray comment to Roseman in late 2016 telling him to "get some balls."  But, a mere offensive remark like this, even if discriminatory, does not give rise to a "hostile work environment" as that term is defined under the law.  *Knox*, 375 F.3d at 459–60; *Stone v. West*, 133 F. Supp. 2d 972, 987 (E.D. Mich. 2001) (plaintiff's complaints about colleague calling her "bitch" and saying she had to review plaintiff's work each night to see what she had done wrong were "nothing more than a handful of more-or-less petty quarrels . . . [and were] not the sort of 'extreme' or 'pervasive' conduct needed to establish a hostile work environment claim . . ."); *Hunter v. Gen. Motors LLC*, No. 19-1884, 2020 WL 1845871, at *4 (6th Cir. Apr. 13, 2020) (holding that "discriminatory" statements in question not "sufficiently severe").  Ark's comment also was made well before the other incidents about which Roseman complains, and he agrees FCA handled the matter satisfactorily.  (ECF No. 87-2, PageID.2329.)[4]

Next, Roseman complains about being issued a verbal reprimand related to his posting election flyers that depicted him with a firearm and a slogan about him being a "new sheriff." Specifically, the reprimand stated:

> John Roseman [] displayed a bulletin in various work locations that displayed him with a rifle, with the notation on the bulletin, "new sheriff in town. [sic][5]  The bulletin is considered to be inappropriate for the workplace.

---

incident should be analyzed in conjunction with the other incidents.  As discussed herein, however, even doing so shows that Roseman's hostile work environment claims fail.

[4] Roseman does not identify any specific earlier problems he had with Ark ("I'm referring to none in particular"), but to the extent any existed, they do not rise to the level of actionable harassment; Roseman characterized them as mere "friction."  (ECF No. 87-2, PageID.2328.)

[5] Any dispute about whether the flyer in question merely said "new sheriff" or "new sheriff in town" is immaterial, and hardly presents "the same difference between rape and consensual sex," as Roseman asserts.  (ECF No. 92, PageID.2677).

(ECF No. 40-1, PageID.641.) (footnote added).

An objective person would not find this mild reprimand to be "severe" or disproportionate to the circumstances; indeed, far more serious consequences were considered and rejected.  (ECF No. 90-15, PageID.2565.)  Moreover, Roseman, after refusing to sign an acknowledgement of the reprimand, continued working in his position.  Again, this shows that while the entire incident, including Roseman having to wait a few hours in the lobby for the reprimand meeting to start, may have displeased him, from an objective point of view, it was short-lived and not "severe."[6]

Finally, the Court turns to Roseman's complaints that arose in late July 2018 when he had been filling in as Team Leader for Hall.  Amond circulated group text messages to co-workers that were critical of Roseman's management style.  In one, Amond wrote, "I guess since we got a new [team leader] for this week it comes with new rules and micro management [sic]."  (ECF No. 40-1, PageID.665.)  In another, Amond wrote "[s]tay woke everyone john the reason we all having a meeting and finna get watched masking," and "[r]emember every be on time y'all kno [sic] who made it hot up there so stay woke [sic]."  (ECF No. 40-1, PageID.669-671.)

Roseman notes that upon showing the text messages to his supervisor, Jana Hines, Hines

---

[6] Indeed, while Roseman now tries to debate the definition of the word "sheriff," and did not think he deserved any reprimand for posting the flyers, he "agreed [] [to] remove all offending bulletins" and told FCA, "You may offer my most sincere apologies to the 'anonymous' person or persons finding the bulletin unagreeable.  We all want to work in as safe and respectable environment as possible and no effort in that regard is futile.  I apologize for any [] problems this may have caused . . . People have varying reaction to all advertisements . . . When putting together an add [sic] or campaign bulletin, one cannot predict what opinions or biases, reasonable or unreasonable will ensue."  (ECF No. 9, PageID.164).  Accordingly, FCA's rejection of Roseman's demand for a public apology was reasonable and not "harassment."  (ECF No. 40-1, PageID.639-40.)  Finally, while Roseman now raises this issue in connection with a claim of racial harassment, at the time, he himself alleged that the decision to issue him a reprimand was "political."  (compare ECF No. 40, PageID.625 ("FCA's infringement upon Plaintiff's right to bear arms was racially motivated by the premise:  A black man in possession of a firearm is latently illicit and illegitimate.") with ECF No. 40-1, PageID.640 (asserting FCA's "motivation is and was political.")).

told him, "No one should have to work like that." (ECF No. 40-1, PageID.675). But Hines' subjective opinion does not supplant the law. She may be correct that no employee should have to work with others who make insubordinate or insulting remarks; however, the law requires far more to establish a "hostile environment" under the ELCRA. As the Sixth Circuit has explained, "we are to distinguish between harassment and harassment that is based on a plaintiff's protected status. Therefore, only those incidents that occurred because of [plaintiff's protected status] are properly considered in the context of her hostile work environment claim." *Howard v. Bd. of Educ. of Memphis City Sch.*, 70 F. App'x 272, 282 (6th Cir. 2003). Accordingly, Amond's text messages, which relate solely to Roseman's managerial style, and his alleged staring at Roseman, do not even implicate the ELCRA. *Id.* Moreover, the various factors that the Court must consider all favor finding that Amond's texts and conduct were not sufficiently "severe or pervasive" to create a hostile work environment under the ELCRA. While perhaps unprofessional and disrespectful to Roseman, no threats of physical violence were made, and the entire dispute took place over a brief period of time. *See Jordan*, 464 F.3d at 597; *Knox*, 375 F.3d at 459–60; *Stone*, 133 F. Supp. 2d at 987; *McDaniel v. Wilkie*, No. 19-3304, 2020 WL 1066007, at *2 (6th Cir. Jan. 31, 2020) (isolated incidents of allegedly "inappropriate" staring not sufficiently severe for hostile environment).

The Defendants' handling of the dispute also does not constitute "severe or pervasive" harassment. Roseman seems to allege that in refusing to discipline Amond for his conduct, Defendants engaged in harassment based on gender and age. But Roseman has failed to raise a material question of fact on either of these claims. First, he claims that FCA treated him differently than a similarly situated female employee, Kayanne Gaddis ("Gaddis"), who had also complained about Amond. In March 2018, Amond told Gaddis he was going to hire a hitman to visit her. (ECF No. 90-15, PageID.2566.) FCA suspended Amond and Gaddis pending an investigation.

(*Id.*)  Both returned to work a few days later, and continued to work together without incident. (*Id.*)  Roseman now argues that Gaddis's complaint was investigated immediately, and Amond was promptly suspended, because Gaddis was a woman.  (ECF No. 40.)

This incident does not support Roseman's hostile workplace claim.  Amond's threat to hire a hitman to visit Gaddis is far more serious and threatening than his criticism of Roseman's management style.    And, FCA reasonably determined that Amond's texts did not merit investigation or discipline because they were not "aggressive."  (ECF No. 40-1, PageID.676.)  In short, while Roseman wished FCA would have taken immediate action against Amond, its failure to do so cannot objectively be characterized as having created a "severe or pervasive" hostile work environment based on sex.  *Knox*, 375 F.3d at 459–60; *Stone*, 133 F. Supp. 2d at 987.

Second, Roseman relies on a conversation he had with Hall after the two discussed Amond's conduct.  Hall agreed to discuss Roseman's concerns with Amond.  In doing so, Hall told Amond, "John's an OLD HEAD."  (ECF No. 40, PageID.606.)  Hall then reported this conversation back to Roseman and told Roseman that Amond would not be further disciplined. (*Id.*)  Again, this isolated comment does not give rise to a "severe or pervasive" hostile work environment.[7]  *Knox*, 375 F.3d at 459–60; *Stone*, 133 F. Supp. 2d at 987.

In sum, even viewing all of the above disputes collectively, no objective, reasonable person would say that Roseman was subjected to "severe or pervasive" harassment because of his membership in a protected class.  At most, he has shown a few isolated instances over a few years

---

[7] While immaterial to the above analysis, the Court notes Roseman's admission that Hall may not have used this term in a derogatory manner.  While Roseman presents certain potential negative meanings of the phrase "old head," he also wrote, "Wiktionary defines oldhead as follows: noun 1. (African American Vernacular) An older person, especially one who acts as a leader or mentor. Hall, the Local 1700 alternate chief steward and delegate/agent of FCA, who referred to Plaintiff as an "oldhead" is African-American."  (ECF No. 92, PageID.2670.)

where he was treated unprofessionally by co-workers, and then did not get the type of management support he thought was warranted.  Accordingly, Defendants are entitled to summary judgment on Roseman's hostile work environment claims.

> 2.    *Defendants are Entitled to Summary Judgment on Roseman's Age, Gender, and Race Discrimination Claims (Counts I, II, IV)*

The same facts that Roseman used to support his harassment claims are used to support his disparate treatment discrimination claims under the ELCRA and ADEA.  In order to prove a prima facie case of discrimination under the ELCRA and/or the ADEA, Roseman must prove that he:  1) belongs to a protected class, 2) suffered an adverse employment action, 3) was qualified for the position, and 4) was replaced by someone outside the protected class or treated differently than similarly situated employees from outside the class.  *See Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 134 (2003); *Williams v. Dearborn Motors 1, LLC*, No. 17-12724, 2020 WL 1242821, at *4 (E.D. Mich. Mar. 16, 2020).

Roseman must also show causation, although different standards apply to his ADEA and ELCRA discrimination claims.   Under the ADEA, a plaintiff "must offer evidence that the employer's adverse action would not have been taken against him but for his age . . . '[I]t is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather the ADEA's 'because of' language requires that the plaintiff prove by a preponderance of the evidence ... that age was the 'but-for' cause of the challenged employer decision.'"  *Sicuso v. Carrington Golf Club, LLC*, No. 17-13938, 2019 WL 296703, at *5 (E.D. Mich. Jan. 23, 2019) (internal citations omitted).  "In contrast to the ADEA's 'but-for' causation burden, under the ELCRA, a plaintiff must ultimately prove that the defendant's discriminatory animus was a 'substantial' or 'motivating factor' in the decision."  *Id.*, at *7 (internal citations omitted).

Under the burden-shifting framework that applies to Roseman's discrimination claims,[8] if he can make a *prima facie* showing, the burden shifts to the Defendants to articulate a legitimate, non-discriminatory/non-retaliatory reason for the alleged adverse action.  *See Hunter v. Gen. Motors LLC*, No. 17-10314, 2019 WL 1436847, at *6 (E.D. Mich. Mar. 31, 2019), *aff'd*, No. 19-1884, 2020 WL 1845871 (6th Cir. Apr. 13, 2020).  If the Defendants do so, the burden shifts back to Roseman to show, by a preponderance of the evidence that the Defendants' proffered reasons were pretextual.  *Id.*  "A plaintiff may establish that the defendant's proffered reasons is mere pretext by establishing that it: (1) has no basis in fact; (2) did not actually motivate plaintiff's termination; or (3) was insufficient to warrant plaintiff's termination."  *Id.*

Roseman fails to raise a material question of fact that he suffered an adverse employment action, that he was treated differently than a similarly situated employee outside of his protected class, and that FCA's stated reasons for his ultimate termination were pretextual.

### a.   *Prima Facie* Case

"What constitutes an adverse employment action has received considerable attention by both state and federal courts applying either the [EL]CRA or its federal counterpart, Title VII of

---

[8]  Discrimination claims like the Roseman's may be established through either direct or circumstantial evidence.  Direct evidence is evidence that, if believed, "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003); *see also Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020) ("Direct evidence is 'evidence that proves the existence of a fact without requiring any inferences.'"  Such evidence 'requires the conclusion that [the protected status in question] was the 'but for' cause of the employment decision.'  In other words, direct evidence must 'include[ ] both a predisposition to discriminate and that the employer acted on that predisposition.'") (internal citations omitted).  "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race, gender, or age]" constitute direct evidence.  *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) (internal quotation omitted).  None of Roseman's evidence regarding the Defendants' conduct can be characterized as such "direct" evidence of discrimination, so he must prove his *prima facie* case of discrimination through circumstantial evidence.

the Civil Rights Act."  *See Pena v. Ingham Co. Rd. Comm'n*, 255 Mich. App. 299, 311-12 (2003).

In *Wilcoxon v. Minnesota Mining & Mfg. Co.,* 235 Mich. App. 347 (1999), the Michigan Court of

Appeals defined an adverse employment action as an employment decision that is "materially

adverse" or more than a "mere inconvenience or an alteration of job responsibilities.  *Id*. at 364

(citations omitted).  There must be some objective basis for demonstrating that the change is

adverse.  *Id*.  A plaintiff's "subjective impressions" as to the desirability of an action is not

controlling.  *Id*.  "Although there is no exhaustive list of adverse employment actions, typically it

takes the form of an ultimate employment decision, such as 'a termination in employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices that might be unique

to a particular situation.'"  *See Pena,* 255 Mich. App. at 312.  "In determining the existence of an

adverse employment action, courts must keep in mind the fact that '[w]ork places are rarely idyllic

retreats, and the mere fact that an employee is displeased by an employer's act or omission does

not elevate that act or omission to the level of a materially adverse employment action.'"  *Id*.

The Court begins with Roseman's sex discrimination claim, which is based on his

contention that a female employee, Gaddis, was treated better when she complained about Amond

than Roseman was treated when he complained about Amond in 2016.  But Gaddis was suspended

along with Amond, and FCA's mere failure to discipline Amond when Roseman complained does

not constitute an adverse employment action vis-à-vis Roseman.  *Pena,* 255 Mich. App. at 312.[9]

---

[9] Moreover, the two incidents in question cannot reasonably be characterized as sufficiently similar such that one could infer FCA's refusal to discipline Amond when Roseman complained suggests a sex-based discriminatory intent.  Gaddis alleged that Amond threatened to hire a hit man to kill her, whereas Roseman merely alleged that Amond sent a few text messages that were critical of his management style.  (ECF No. 87, PageID.2306.)  Because of the significant difference in severity in Amond's conduct, Gaddis and Roseman are not similarly situated.

Moreover, it is undisputed that after Roseman lodged his complaint, he was not terminated, demoted, docked pay or hours, or disciplined in any way.  Rather, he continued working at FCA for almost two more years.  In sum, Gaddis was not a "similarly situated" employee, and Roseman suffered no "adverse employment action."

Roseman's age discrimination claim fares no better.  He focuses on Hall's isolated comment to Amond in which Hall referred to Roseman as an "old head."  But being subjected to (or, here, the subject of) such a comment does not constitute an adverse employment action.  *See Howard v. Bd. of Educ. of Memphis City Sch.*, 70 F. App'x 272, 280 (6th Cir. 2003) (holding that "racially insensitive comments may have been offensive" but did not constitute "an adverse employment action."); *Pena,* 255 Mich. App. at 312; *Fandakly v. Thunder Techs.*, LLC, No. 17-11256, 2018 WL 1965082, at *5 (E.D. Mich. Apr. 26, 2018).

Roseman's race discrimination claim relates to FCA's handling of the election flyers he posted at the plant with a photo of himself holding a rifle and referencing a "new sheriff."  But Roseman received only a verbal warning as a result of this disputed incident, which does not rise to the level of an adverse employment action.  *See, e.g.*, *Magyar v. United States Postal Serv.*, No. 18-13447, 2019 WL 1989207, at *6 (E.D. Mich. May 6, 2019) ("Formal criticisms or reprimands that are not accompanied by additional disciplinary action such as a negative change in grade, salary or other benefits, do not constitute adverse employment actions."); *Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019) (letter of reprimand along with a paid suspension from work did not constitute an adverse employment action); *Finley v. City of Trotwood*, No. 11-4277, 503 Fed.Appx. 449, 454 (6th Cir. Nov. 1, 2012) (holding that "verbal warnings" did not constitute adverse employment action).

For the above reasons, Roseman failed to raise a material question of fact that any of the

incidents of alleged sex, age, or race discrimination resulted in an adverse employment action against him or that he was treated differently than a similarly situated employee outside of his protected class.

### b. Causation

The fact that FCA ultimately terminated Roseman's employment does not change the result. Certainly, in general, a termination of employment is an adverse employment action. But even taking Roseman's termination into account, Defendants are entitled to summary judgment. First, when Roseman commenced this action asserting his discrimination claims, he was still employed by FCA. Thus, his termination about five months after the last incident he complained about cannot reasonably be characterized as an "adverse employment action" that was caused by those incidents. Second, FCA has presented legitimate, non-discriminatory reasons for terminating Roseman, and he proffered no evidence that those reasons were pretext for sex, age, or race discrimination. The undisputed evidence is that after FCA declined to discipline Amond for the text messages he sent about Roseman, Roseman immediately chose to take a leave and remained on leave for months. He was ordered back to work only after a physician deemed him capable of returning without accommodation after performing an IME. And, FCA even offered to return to Roseman to his old position with the assurance that Amond would be transferred to a different position so the two would not be working together. FCA proffers evidence that Roseman was terminated only because, notwithstanding all of that, he refused to return to work. (ECF No. 8-3.) Roseman presents no evidence that FCA terminated him for any other reason.[10] Thus,

---

[10] Roseman's contention that Dr. Talon refused to accept information during the IME that bore on Roseman's ability to return to the FCA plant does not create a material question of fact. (ECF No. 92, PageID.2667; ECF No. 92-6; ECF No. 40-1, PageID.699-700.) Roseman makes only unsupported, speculative assertions about that matter without specifying what information he would have shared, or how it would have showed he was unable to return to the plant given FCA's

Roseman failed to raise a material question of fact that FCA's non-discriminatory reason for his termination is pretext for discrimination based on his sex, age, or race. *Hunter*, 2019 WL 1436847, at *6.

Roseman has two counters, neither of which is availing. First, in his response to FCA's summary judgment motion, he argues, "Defendant FCA initially tried to force Plaintiff to return to work with Amond, having not removed him from work area and department Plaintiff is assigned to [] and only offered to remove Amond after telephone conference with court on November 8, 2018 [] a few days before hearing on Plaintiff's TRO motion []. Plaintiff believes that he has legitimate reasons for preferring not to return to work as FCA propose and Michigan Court appears to agree. *See* Administrative Judge Order (ECF No. 82: Exhibit A)." (ECF No. 92, PageID.2669).

Any issue about the timing of FCA's offer to remove Amond lacks merit as it still came well before it terminated Roseman's employment. The "Administrative Judge Order" to which Roseman refers arose in connection with his application for unemployment benefits. (ECF No. 82, PageID.2224-2231.) FCA had argued in that matter that Roseman left work voluntarily, and was therefore disqualified from receiving benefits under Section 29(a)(1) of Michigan's Employment Security Act, MCL § 421.29(a)(1). Roseman is correct that that matter was adjudicated in his favor, however, the ALJ's ruling was based on the fact that "[n]o documents were admitted into evidence, and that the "burden of proof never shifted to [Roseman] to provide

---

offer to transfer Amond. (*Id.*) Moreover, Roseman's real contention is that the order for him to return to work does not properly take into account the stress such a return would have allegedly put him under. But he brings only sex, age, and race discrimination claims, and does not assert a claim of disability discrimination. (ECF No. 40.) Roseman cannot assert a disability claim by vaguely alluding to the Americans with Disabilities Act in his response to FCA's summary judgment motion. (ECF No. 92, PageID.2680.) *Cox v. Blue Cross Blue Shield of Michigan*, No. 1:12-CV-320, 2013 WL 1838314, at *4 (W.D. Mich. May 1, 2013) ("A plaintiff cannot raise a new claim in response to a summary judgment motion . . .").

a legitimate explanation for any absences from work." (*Id.*, PageID.2228). Here, in contrast, the undisputed evidence before this Court is that FCA terminated Roseman because he refused to return to work after Dr. Talon said he could do so and FCA agreed to transfer Amond to a different position, and the burden shifted to Roseman to show FCA's reason was pretextual. *Hunter*, 2019 WL 1436847, at *6. Roseman presents no evidence that FCA terminated him due to any discriminatory reason. He thus failed to raise a material question of fact on this required element of his discrimination claims.

Second, Roseman argues that the stress he endured from the alleged discrimination forced him to take a leave of absence and then made him unable to return to work, and, thus, he was constructively discharged. (ECF No. 40, PageID.607.) While a constructive discharge could constitute an "adverse employment action," Roseman fails to raise a material question of fact on that issue. "To constitute constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). Roseman has produced no evidence from which a reasonable person would conclude that FCA and/or the other Defendants deliberately created intolerable working conditions with the intention of forcing him to quit. (ECF No. 40-1.) Indeed, Roseman's own evidence shows FCA and union officials attempting to work with him over his dispute with Amond. While Hall did not remove Amond from work as Roseman wanted, Hall met with Amond, and then with Roseman to discuss the matter. (ECF No. 40, PageID.606.) Hines offered to go to labor with Roseman to follow-up on his concerns. (*Id*. at PageID.608.) And, ultimately, FCA offered Roseman his position back with Amond being transferred to a different department so that the two would not be working together. Again, even if Roseman subjectively

believes Defendants' actions were inadequate, no reasonable person would view their conduct as an attempt to create intolerable working conditions for Roseman.[11]

For all of the above reasons, Defendants are entitled to summary judgment on Roseman's sex, age, and race discrimination claims.

### 3.    Defendants are Entitled to Summary Judgment on Roseman's ELCRA Retaliation Claim (Count III)

Roseman's ELCRA retaliation claim is quite amorphous.  Roseman alleges that after he "complained of racial discrimination in Defendants [sic] behavior in March of 2018 [as to the flyer incident]," Defendants "had sufficient motive to retaliate" and that their "fail[re] to take all reasonable steps necessary to prevent [future] harassment" was unlawful retaliation.  (ECF No. 40, PageID.611.)

The "ELCRA prohibit[s] retaliation based on an individual's opposition to discriminatory conduct."  *Gaines v. FCA US LLC*, No. CV 18-11879, 2020 WL 1502010, at *11 (E.D. Mich. Mar. 30, 2020).  To establish a prima facie case of retaliation, a plaintiff must demonstrate: "(1) that the plaintiff engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action."  *Id.*  Under the ELCRA, the protected activity must be a "significant factor" in the adverse employment action.

---

[11] The Court has considered Roseman's contention "that this Court overlooked circumstances for which a reasonable, average, or otherwise qualified worker would give up his employment like direct evidence that Defendant-employer FCA on more than one occasion colluded with Plaintiff's union representatives to usurp FCA's protection policies and procedures when Plaintiff complained of co-workers harassment and threatening behavior."  (ECF No. 82, PageID.2221; ECF No. 92, PageID.2680.)  The Court previously recognized Roseman's longstanding employment with FCA, but explained that his subjective beliefs are immaterial to the salient issue: whether he can present sufficient *evidence* to meet the burdens that apply under the law.  (*See* ECF No. 81, PageID.2216-17; ECF No. 32, PageID.461, 470-72.)  For the reasons stated herein, Roseman failed to do so.

*Id.* (citing *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 n. 2 (6th Cir. 2008)). "Retaliatory harassment by a supervisor or a supervisor's failure to act to stop retaliatory harassment by co-workers can constitute an adverse employment action for purposes of a retaliation claim." *Id.* (citing *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 791 (6th Cir. 2000) and *Meyer v. City of Ctr. Line*, 242 Mich.App. 560, 619 N.W.2d 182, 188-89 (Mich. Ct. App. 2000)).

Roseman's ELCRA retaliation claim fails because he cannot satisfy even the first element. For a plaintiff's conduct to be "protected activity," it must clearly convey that the employee is raising the specter of a claim of unlawful discrimination **under the ELCRA**. Making a complaint about matters not protected by the ELCRA is not engaging in "protected activity." As the court explained in *Barrett v. Kirkland Cmt. Coll.*, 245 Mich. App. 306, 319 (2001):

> Plaintiff cannot prevail on a claim of retaliation in violation of the CRA without establishing that he engaged in activity protected under the act. [] MCL 37.2701(a); MSA 3.548(701)(a) specifically defines the type of activity protected under the CRA. As it relates to this action, the CRA specifically prohibits retaliation or discrimination because "the person has opposed a violation of this act, or because the person has made a charge ... under this act." Applying M.C.L. § 37.2701(a); MSA 3.548(701)(a) to the facts of this case, we must determine whether plaintiff's oral complaint to [his supervisor] amounted to a charge made under the CRA or opposition to a violation of the CRA. We conclude that it did not.

> * * *

> Plaintiff did not take any action that could be construed as a "charge" under the act. An employee need not specifically cite the CRA when making a charge under the act. However, the employee must do more than generally assert unfair treatment. [] The employee's charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to the CRA. [] Plaintiff's oral complaint to [his supervisor] failed to meet this standard. Plaintiff alleges unlawful discrimination because of sex. . . . Plaintiff never complained that he was subjected to any physical or verbal conduct of a sexual nature []. Nor did plaintiff complain that he was treated differently because of his gender. Under these circumstances, an objective employer could not conclude that plaintiff was raising the specter of a claim pursuant to the CRA. Rather, the evidence merely established that plaintiff was asserting generic, non-sex-

26

based complaints regarding his working conditions and that those complaints were not based on sex.

*Id.*, at 319-20. *See also Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1313 (6th Cir. 1989) ("a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 374 (6th Cir. 2013); *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).

Roseman claims that he "engaged in protective activity, having complained of racial discrimination" following the March 2018 flyer incident in which he (1) received a verbal warning and (2) had his request for a grievance rejected by the union. (ECF No. 40, PageID.611.) But Roseman's own evidence shows his underlying allegation to be untrue. Indeed, in Roseman's grievance/complaint, he made no mention whatsoever of racial discrimination, and instead claimed, "It is reasonable to deduce from the context of this FACA Displinary [sic] Action that the motivation is and was political." (ECF No. 40-1, PageID.640). Because Roseman's complaint contained no assertion of unlawful race discrimination, his submission of that complaint cannot be the "protected activity" required for him to succeed on his ELCRA retaliation claim. *Barrett*, 245 Mich. App. at 319. As such, Roseman's retaliation claim fails.

Moreover, as discussed above, *see supra* at 19-25, Roseman also fails to raise a material question of fact as to whether he suffered an "adverse employment action."

For all of these reasons, Defendants are entitled to summary judgment on Roseman's ELCRA retaliation claim.

    4. *Defendants are Entitled to Summary Judgment on Roseman's Intentional Infliction of Emotional Distress Claim (Count IX)*

Roseman claims that the Defendants intentionally inflicted emotional distress by failing to discipline Amond for the text messages he sent criticizing Roseman's management style. (ECF

No. 40, PageID.616.)  Specifically, Roseman notes that after he showed Amond's texts to Hines, she told him "no one should have to work like this," but that Amond was nevertheless allowed to continue working at FCA without any repercussions.  (*Id.* PageID.616-17.)  Roseman equates Amond's texts and statements to a "hazard," stating Hines and Hall, "appraised the hazard, advised Plaintiff, that he was in fact dangerously and unreasonably proximate to hazard, and then willfully and recklessly subjected Plaintiff to said hazard, fully anticipating that Plaintiff would suffer injury from the hazard."  (*Id.*, PageID.617.)

A claim of intentional infliction of emotional distress ("IIED") under Michigan law requires a plaintiff to establish four elements: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress."  *See Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 496 (6th Cir. 2002) (*citing Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594 (1985)).  IIED claims have an extremely high standard of proof.  "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," and "[i]t is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort."  *Graham v. Ford*, 237 Mich. App. 670, 674 (1999).  To be considered "extreme and outrageous," the conduct in question must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Sperle*, 297 F.3d at 496 (internal quotations omitted).  In ruling on an IIED claim, "it is initially for the [trial] court to determine whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery."  *Doe v. Mills*, 212 Mich. App. 73, 92 (1995).

Roseman's IIED claim fails to clear this high bar.  He complains that after Amond was openly critical of his management style and decisions, FCA did not discipline Amond, and the Union Defendants did not advocate for him.  This challenged conduct falls well short of the "extreme and outrageous" threshold necessary to sustain Roseman's IIED claim.  Courts have found that far more severe conduct did not constitute the "extreme and outrageous" conduct required to state an IIED claim.  For example, in *Hilden v. Hurley Med. Ctr.*, 831 F. Supp. 2d 1024, 1047 (E.D. Mich. 2011), *aff'd*, 504 F. App'x 408 (6th Cir. 2012), the court dismissed an IIED claim brought against an employer who allegedly chased an employee through the halls of a hospital while shouting and yelling.  *Id.*  In *Meek v. Michigan Bell Tel. Co.,* 193 Mich. App. 340, 342-343 (1991), the court dismissed an IIED claim arising from workplace bullying that allegedly involved extensive sexual and religious harassment, in addition to persistent threats of discipline, insults about the quality of the plaintiff's work, and slurs relating to her physical stature.  And, in *Burton v. Kroger Corp.*, No. 11-CV-12783, 2012 WL 1392084, at *9 (E.D. Mich. Apr. 20, 2012), the court found that the plaintiff employee's complaints of "harassment" by coworkers – walking by her "in an offensive way," gossiping about her, and laughing at her – did not rise "to the level of atrociousness required to maintain an intentional infliction of emotional distress claim."

Roseman counters that Hines's opinion was that "no one should have to work like this." But, again, Hines's subjective opinion does not take precedence over the relevant law.  And, Roseman's contention in his own summary judgment motion that FCA "failed to promptly investigate [his] complaint," and that its "response was atrocious, unreasonable, and not calibrated to the severity of the conduct in light of the circumstances of the case at the time the allegations were made," grossly mischaracterizes the evidence.  (ECF No. 26, PageID.387).  Again, the reality is that Hines raised Amond's texts with FCA representatives shortly after she learned of them, and

that FCA promptly considered them, and reasonably found they were not aggressive or threatening.

In sum, while FCA, certain of its employees, and the Union Defendants' representatives might have acted in a manner Roseman disapproved of, none of their actions went "beyond all possible bounds of decency" such that they could "be regarded as atrocious, and utterly intolerable in a civilized community."  Defendants are therefore entitled to summary judgment on Roseman's IIED claim, and Roseman's summary judgment motion as to that claim should be denied.

> ### 5.    *FCA is Entitled to Summary Judgment on Roseman's Negligent Retention of an Unfit Employee Claim (Count X)*

Roseman alleges that "Defendant FCA negligently retained unfit employee Dominick Amond, to Plaintiff's detriment, economic loss and personal injury."  (ECF No. 40, PageID.621.) He also claims that Amond "has now colluded with Defendants FCA and Local 1700 to drive Plaintiff from his job with threats and animus causing Plaintiff injury and causing Plaintiff, to lose over $50,000.00 in wages."  (*Id*. at PageID.623.)  FCA argues that this claim fails because, "[u]nder the common-law claim of negligent retention of an employee, an employer 'may be held liable for an intentional tort committed by one of its employees if the employer 'knew or should have known of his employee's propensities and criminal record before commission of an intentional tort.''" (ECF No. 87, PageID.2310)(quoting *Hersh v. Kentfield Builders, Inc*., 385 Mich. 410, 412 (1971)).

Roseman's claim fails because (1) he has shown no "intentional tort" that Amond committed against him, and (2) he presented no evidence that would reasonably have put FCA on notice that Amond would commit such an intentional tort in the future.  Indeed, the Michigan Supreme Court has held that for an employee's comments to put an employer on such notice, those comments must have "clearly and unmistakably threaten[ed] particular criminal activity that would have put a reasonable employer on notice of an imminent risk of harm to a specific victim. Comments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an

exasperated, angry comment inexorably results in a violent criminal assault." *Brown v. Brown*, 478 Mich. 545, 555 (2007). "As a general rule, an employer cannot accurately predict an employee's future criminal behavior solely on the basis of the employee's workplace speech." *Id.*, at 557. Amond's text messages that merely criticized Roseman's management style clearly did not rise to a level that would have allowed FCA to expect that Amond would commit an intentional tort against Roseman. Thus, FCA is entitled to summary judgment on this claim.

6.      *Defendants are Entitled to Summary Judgment on Roseman's Libel Claim (Count XI)*

In Count XI of his second amended complaint, Roseman asserts a libel claim against the Defendants related to the manner in which they dealt with the election flyers Roseman posted of himself holding a rifle. Roseman claims that "[w]ith no specificity or reasonableness, Johnson, falsely accused [him] in a written statement of making criminal threats." (ECF No. 40, PageID.623.) Roseman seems to be referencing Johnson's "Supervisor's Report" in which she issued him a "verbal warning" because she found he had "displayed a bulletin in various work locations that displayed him with a rifle, with the notation on the bulletin, 'new sheriff in town. [sic][12] The bulletin is considered to be inappropriate for the workplace." (ECF No. 40-1, PageID.641.) (footnote added).

"To establish a claim of libel or slander, a plaintiff must show: (1) that the defendant made a statement about the plaintiff that was false and defamatory in some material respect; (2) that the statement was communicated to a third person without privilege; (3) fault amounting to at least negligence; and (4) that the statement is actionable regardless of special harm or had a tendency to cause special harm to the reputation of the plaintiff." *Allen v. Mach*, No. 245049, 2004 WL

---

[12] Johnson omitted the closing quotation mark, so it is not clear precisely what verbiage she was purporting to quote from Roseman's flyer.

895868, at *1 (Mich. Ct. App. Apr. 27, 2004)  "A communication is defamatory if, under all the circumstances, it tends to so harm the reputation of an individual that it lowers the individual's reputation in the community or deters others from associating or dealing with the individual."  *Id.* (quoting *Kefgen v. Davidson*, 241 Mich. App 611, 617 (2000)).

Roseman clearly cannot carry this burden of proof.  First, Johnson's challenged statement is not false, at least not in any material respect.  Roseman admits that in connection with his 2018 campaign, he posted flyers of himself holding a rifle with the words "new sheriff."  (*See* ECF No. 40-1, PageID.734-735.)  Although the flyers actually say, "Is it time for a new sheriff" [sic] rather than "new sheriff in town," this minor difference hardly makes Johnson's statement untrue or misleading in any material respect.  Indeed, that difference is completely inconsequential to FCA's concern that Roseman had posted a flyer with a photo of himself holding a rifle.

Second, Roseman fails to show that the disputed aspect of Johnson's statement was "defamatory."  Again, there is no dispute that Roseman's flyer contained a photo of himself with a rifle, with a reference to him being a "new sheriff."  The phrase "new sheriff in town" is hardly an alteration that would give Roseman a reputation different than the one his own words warranted.  Moreover, nothing in Johnson's Supervisor's Report claims Roseman made "criminal threats."  Rather, it simply reported, accurately, FCA's determination that his flyers were merely "inappropriate for the workplace."  (ECF No. 40-1, PageID.645.)

Third, Johnson's communication was privileged.  An employer's internal employment communication enjoys a qualified privilege provided there is (1) good faith; (2) an interest to be upheld; (3) a statement limited in scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only.  *Ryniewicz v. Clarivate Analytics*, No. 19-1161, 2020 WL 1131666, at *6 (6th Cir. Mar. 9, 2020).  Under this doctrine, "[a]n employer has the

32

qualified privilege to defame an employee by publishing statements to other employees whose duties interest them in the subject matter." *Id.* (quoting *Tumbarella v. The Kroger Co.*, 85 Mich.App. 482, 494 (1978). Here, the record shows that FCA addressed Roseman's flyers after other employees complained they felt intimidating, and Johnson's verbal warning was published only to Roseman, Union Steward Smith, and another of Roseman's supervisors. Thus, Johnson's challenged communication clearly satisfies the qualified privilege requirements. *Id.*

For all of the above reasons, Defendants are entitled to summary judgment on Roseman's libel claim.

       7.    *FCA is Entitled to Summary Judgment on Roseman's Second Amendment Claim (Count XIII)*

Roseman claims FCA infringed upon his right to bear arms by disciplining him for posting his campaign flyer. (ECF No. 40, PageID.625.) FCA correctly argues that this claim should be dismissed because the Second Amendment protects an individual only from the *government's* infringement on an individual's right to bear arms, and FCA is a private corporation, not a governmental entity. *See* U.S.C.A. Const. Amend. 2. *See also Fla. Retail Fed'n, Inc. v. Attorney Gen. of Fla.*, 576 F. Supp. 2d 1281, 1295 (N.D. Fla. 2008) (rejecting as "radical and totally unprecedented" the argument that "the right to bear arms operates against private property owners, at least so long as they are corporations," and holding "that the Bill of Rights and Declaration of Rights restrict only government, not private, action is too well settled for argument."). Thus, FCA is entitled to summary judgment on Roseman's Second Amendment claim.

       8.    *The Union Defendants are Entitled to Summary Judgment on Roseman's Breach of Duty of Fair Representation Claims (Counts VI, VII and VIII)*

Roseman also brings claims against the Union Defendants for breach of the duty of fair representation under section 301 of the Labor Management Relations Act, 29 U.S.C. 185(a)

("Section 301").  (ECF No. 40, PageID.613-15.)[13]  In Count VI, he claims that the "UAW and

UAW Local 1700" breached their duty of fair representation by treating him differently than a

"similarly situated" colleague, Gaddis.   Specifically, Roseman asserts that when Gaddis

complained about Amond's "hit man" threat, Amond was promptly suspended, but when Roseman

complained about Amond's text messages, Amond was not investigated or disciplined.  (ECF No.

40, PageID.614.)   In Count VII, Roseman claims that the UAW, Local 140 and Local 1700

"breached the duty of fair representation when its agents/employees, within the clear scope of their

employment arbitrarily discriminated against Plaintiff deciding that his rights would be violated

to protect other UAW union members/co-workers of Plaintiff from discipline."  (*Id.*)  Roseman

does not specify what events this claim relates to, but Local 140 seems to have interpreted it as

challenging its handling of the 2016 incident in which Roseman's colleague, Ark, told him to "get

some balls," and Local 1700 seems to have interpreted it as challenging the handling of Roseman's

complaints about Amond.  Lastly, in Count VII, Roseman alleges that the UAW and Local 1700

beached their duty of fair representation in March 2018 when they refused to file a grievance on

his behalf about the verbal warning he received regarding his election flyers.  (*Id.*, PageID.615.)

Local 1700 and 140 argue that they did not breach their duty of fair representation because they

acted in good faith with legitimate, non-discriminatory, non-arbitrary reasons for their actions.

(ECF No. 89, PageID.2428-29; ECF No. 90, PageID.2492-99.)  The International Union joins in

---

[13] Roseman also asserts in these same Counts a violation of the ELCRA; however, the Court has
already explained why his ELCRA claims fail.  *See supra* at 12-27.  Roseman also vaguely
references the National Labor Relations Act, "29 U.S.C. § 151 *et seq*" (ECF No. 40, PageID.598,
613-15) in his complaint, but because he has sued FCA as a defendant and alleges breaches of the
CBA, this Court lacks jurisdiction over his NLRA claim.  *See San Diego Bldg. Trades Council,
Millmen's Union, Local 2020 v. Garmon,* 359 U.S. 236, 242 (1959); *White v. Anchor Motor
Freight, Inc.,* 899 F.2d 555, 560-61 (6th Cir.1990).  Thus, the Court will limit its analysis to
Roseman's claims under Section 301.

these arguments.  (ECF No. 91, PageID.2601.)

A Section 301 action includes two elements: "(1) that the employer breached a collective bargaining agreement ["CBA"], and (2) that the union breached its duty of fair representation." *See Vencl. v. International Union of Operating Engineers*, 137 F3d. 420, 423 (6th Cir. 1998).  In order to prove that one of the unions breached its duty of fair representation, Roseman "must present specific facts that support a finding 'that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith.'"  *See Danton v. Brighton Hosp*., 533 F.Supp.2d 724, 728 (E.D. Mich. 2008) (*citing Garrison v. Cassens Transport*, 334 F.3d 528, 538 (6th Cir. 2003); *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)).  He "cannot rely on conclusory statements."  *Danton*, 533 F.Supp.2d at 728.  Moreover, a union's "decision on how to pursue a grievance and, ultimately, *not pursue a grievance* are entitled to deference from this Court, and are not actionable if done in good faith."  *Id*. (emphasis added).  Union decisions "in these matters are not considered arbitrary unless they are 'so far outside a wide range of reasonableness as to be irrational.'"  *Id*. (*citing Driver v. United States Postal Service*, 328 F.3d 863, 869 (6th Cir. 2003)).  As this Court stated in *Danton*:

> Mere negligence, error or flaws in logic and judgment cannot sustain a showing of arbitrary action by the Union.  An unwise or even an unconsidered decision by the union is not necessarily irrational.  Instead, Plaintiff must present to this Court material facts that show the Union's actions were "wholly irrational."

*Id*. (*citing Garrison, supra*).  *See also Millner v. DTE Energy Co.*, 285 F. Supp. 2d 950, 962 (E.D. Mich. 2003) ("to meet his burden of proof as to the union's breach of its duty of fair representation, a plaintiff must establish by *substantial evidence* that the union acted arbitrarily, discriminatorily or with bad faith.") (emphasis in original).

Applying this law to the case at bar, Roseman cannot show any action by any of the Union Defendants that was "wholly irrational." First, with respect to Roseman's grievance regarding Local 140 and Darlene Ark, Ark received a one-week suspension for her statement to Roseman. (ECF No. 87-2, PageID.2329.) There is no evidence to show that Local 140 acted in a wholly irrational way with respect to Ark. Nor is there any evidence that Ark's rights were protected to the detriment of Roseman's rights. Moreover, Roseman admits that the investigation and remedy were sufficient. (*Id.*) As such, it is undisputed that Local 140 did not breach its duty of fair representation to Roseman with respect to the Ark incident. It is also undisputed that Local 140 only represented Roseman while he was at WTAP, and the only incident about which Roseman complains from his tenure there was the Ark incident. Thus, Local 140 has no liability for decisions any other union body made after Roseman left WTAP.

Roseman's claim related to his dispute with Amond similarly fails. First, Roseman suggests that Local 1700 discriminated against him because it did not assist him in his dispute with Amond whereas it assisted a female employee, Gaddis, after Amond threatened her. To show that a union breached its duty of fair representation by engaging in discrimination, a plaintiff must "adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n v. Lockridge,* 403 U.S. 274, 301 (1971). Roseman's evidence does not satisfy that standard; as discussed above, Amond's threat to Gaddis was significantly more severe than the text messages he sent that were critical of Roseman's management style. *See supra* at 16-17. Thus, it makes sense that the former would be dealt with more swiftly. Second, Roseman cannot show that Local 1700's actions were "wholly irrational." According to Roseman, Hall expressed reservations about disciplining Amond, stating that he did not want to deal with Cynthia Johnson because he had recently lost a battle with her over another

employee.  (ECF No. 40, PageID.604.)  Moreover, Hall believed he could handle the matter by speaking directly with Amond to – in Roseman's own words – "explain[] away [his] approach to work."  (*Id.*, PageID.606.)  While Hall perhaps should have chosen a term other than "old head" to describe Roseman's approach, given the non-threatening nature of Amond's text messages, this was not a "wholly irrational" way for Hall to handle the situation.

Nor can Roseman show that Local 1700 acted wholly irrationally in its handling of the incident in which Roseman was disciplined for his election flyers.  On March 8, 2018, Local 1700 Union Stewards Smith and Caldwell vigorously negotiated for Roseman's benefit.  (ECF No. 87-2, PageID.2330; ECF No. 90-15, PageID.2564-65.)  FCA Labor Representatives Johnson and Scott had proposed either suspending or terminating Roseman, but Smith and Caldwell argued that such punishments would be disproportionate to Roseman's conduct.  (*Id.*)  Smith instead advocated for a verbal warning, which he thought was "a reasonable resolution," and FCA ultimately agreed. (*Id.*)  FCA prepared a verbal warning and asked Roseman to sign it.  (*Id.* at PageID.2565.) Roseman refused to do so, which led to Johnson again suggesting that Roseman was subject to suspension or termination.  (*Id; see also* ECF 90-3, PageID.2512; ECF No. 90-15, PageID.2565.) Smith again spoke to Johnson on Roseman's behalf, and argued that suspension or termination would be inappropriate.  (ECF No. 90-15, PageID.2565.)  Once again, Smith's advocacy was effective; Johnson agreed to forgo suspending or terminating Roseman, and instead gave him a verbal warning.  (*Id.*)  Roseman continued to disagree with this outcome, but Smith told him that "the union would not be able to get him a better deal . . . this was the best the union would be able to do and that the matter was resolved."  (*Id.*).  Roseman nevertheless asked Spencer to file a grievance on his behalf.  (ECF No. 87-2, PageID.2332; ECF No. 40-1, PageID.643.)  Spencer did not do so "because Mr. Smith had already explained to Mr. Roseman that the matter was resolved."

37

(*Id.*; ECF No. 90-16; PageID.2577.)

The foregoing makes clear that Roseman received not only reasonable, but effective representation from Local 1700.  FCA was seeking his suspension and/or termination due to his conduct, which it deemed to be "inappropriate for the workplace."  Yet through his Local 1700 representatives, Roseman received only a verbal warning that did not impact his employment status in any material way.  Having achieved this success for Roseman, and particularly considering Roseman's refusal to even acknowledge the verbal warning, Smith and Spencer's decision not to pursue a grievance was not "irrational."[14] *Millner*, 285 F. Supp. 2d at 963 ("Unions may lawfully elect not to arbitrate grievances that they determine lack merit."); *Danton*, 533 F.Supp.2d 728; *Driver*, 328 F.3d at 869.

For all of these reasons, the Union defendants are entitled to summary judgment on Roseman's breach of duty of fair representation claims.

> 9.      *Defendants are Entitled to Summary Judgment on Roseman's Civil Conspiracy Claim (Count V)*

Roseman alleges a vast civil conspiracy between FCA and the Union Defendants to violate his civil rights and "breach relevant employment contract(s)/collective bargaining agreements and public policy."  (ECF No. 40, PageID.612.)  FCA argues the claim must be dismissed because he fails to establish a separate actionable tort.  (ECF No. 87, PageID.2312.)  The Union Defendants argue that any such claim against them must be dismissed as preempted by Section 301.  (ECF No.

---

[14] For all of these same reasons, Roseman's motion for summary judgment on this particular claim (ECF No. 77) necessarily fails.  Similarly, Roseman's breach of contract claim against the International Union (Count XII) fails.  Roseman alleges that the International Union "was legally obligated to address the ongoing failure to process [Roseman's] grievance [that] its affiliate Local 1700 refused to process . . ." but "disregarded" that failure.  (ECF No. 40, PageID.624.)  Since Local 1700's refusal to advance that grievance is not actionable, the International Union's alleged "disregard" of that failure cannot be actionable.

38

89, PageID.2433; ECF No. 90, PageID.2499; ECF No. 91, PageID.2602.)

"A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." *See Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). A plaintiff cannot succeed on a conspiracy claim where there is no underlying violation. *See Wiley v. Oberlin Police Dept.*, 330 F. App'x 524, 530 (6th Cir. 2009). Because, for the reasons explained above, Roseman's ELCRA, ADEA, and other underlying statutory and common law claims fail, so too does his civil conspiracy claim fail. *Id.*

Moreover, to the extent Roseman's civil conspiracy claim rests on an alleged intent to breach one or more of "employment contract(s)/collective bargaining agreements," the Union Defendants are correct that such claim is barred by Section 301, which states:

> Suits for violation of contracts between an employer and a labor organization representing employees is an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties.

*See* 29 U.S.C. § 185(a).

This statute's preemptive effect on state law claims was first analyzed in *Teamsters v. Lucas Flour Co.*, 369 U.S. 95 (1962). In *Teamsters*, the U.S. Supreme Court held that "in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *See id.* at 104. This preemptive effect has gone beyond suits alleging contract violations and has been extended to defamation claims and civil conspiracy claims arising out of collective bargaining agreements. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985); *DeCoe v. General Motors Corp.*, 32 F.3d 212, 217 (6th Cir. 1994).

The Sixth Circuit has developed a two-step approach for determining whether Section 301 preemption applies. *See DeCoe,* 32 F.3d at 216. "First, the district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms." *Id.*

(citations omitted).  "Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law."  *Id*.  "If the right both is borne of state law and does not invoke contract interpretation, then there is no preemption."  *Id*.

Roseman's civil conspiracy claims are borne out of his collective bargaining agreement; indeed, he specifically alleges that the Defendants "illegally colluded and conspired to breach relevant employment contract(s)/collective bargaining agreements."  (ECF No. 40, PageID.612.)  As stated by the Union Defendants, this is not a case where "Plaintiff has attempted to artfully plead his state law claims without asserting or without reference to" the CBA.  (ECF No. 89, PageID.2434.)  Based on Roseman's own civil conspiracy allegations, the Court would need to interpret terms of the CBA to determine the claim's validity.  Moreover, the rights and obligations at issue in Roseman's breach of contract claim are ones created by, and arising under the CBA, not state law.  Thus, both parts of the *DeCoe* test are satisfied, and Roseman's civil conspiracy claim is barred by Section 301.

For all of these reasons, Defendants are entitled to summary judgment on Roseman's civil conspiracy claim.

## II.      RECOMMENDATION

For the reasons set forth above, it is **RECOMMENDED** that the Defendants' motions for summary judgment **(ECF Nos. 87, 89, 90, 91)** be **GRANTED** and Roseman's motions for summary judgment **(ECF Nos. 77, 78)** be **DENIED.**


Dated: April 21, 2020                                          s/David R. Grand
Ann Arbor, Michigan                                          DAVID R. GRAND
                                                                      United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 21, 2020.

<div style="margin-left: 40%;">

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

</div>